IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-146

No. 530A20

Filed 5 November 2021

IN THE MATTER OF: W.K.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 22 September 2020 by Judge Laurie L. Hutchins in District Court, Forsyth County. This matter was calendared for argument in the Supreme Court on 30 September 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Andrew L. Fitzgerald for petitioner-appellees.*

*No brief for appellee Guardian ad Litem.*

*Peter Wood for respondent-appellant father.*

HUDSON, Justice.

¶ 1  This case involves a private termination of parental rights proceeding initiated by petitioners, the paternal grandmother and step-grandfather of W.K. (Wallace).[1] Respondent, Wallace's father, appeals from the trial court's order terminating his parental rights. We affirm.

I.  **Factual Background and Procedural History**

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading.

¶ 2        In April 2015, Wallace was born to respondent and Wallace's biological mother in Virginia. Respondent and Wallace's mother were never married. Wallace lived with his mother. Respondent did not live with them. On 25 November 2015, respondent was indicted on federal drug-related charges and subsequently pled guilty in the United States District Court for the Western District of Virginia to conspiracy to possess with intent to distribute fifty grams or more of methamphetamine. On 23 September 2016, respondent was sentenced to a term of ninety-five months imprisonment, followed by four years of supervised release. His projected release date is 4 July 2022.

¶ 3        In June 2017, petitioners were contacted by the Wythe County Department of Social Services in Virginia after Wallace's mother was arrested. A 16 June 2017 safety plan developed by the Wythe County Department of Social Services reflects allegations of physical and mental abuse and neglect of Wallace by his mother. Petitioners traveled to Virginia to pick up Wallace, and Wallace has been in petitioners' custody in North Carolina since 16 June 2017. On 13 July 2017, petitioners were granted sole legal and physical custody of Wallace.

¶ 4        On 2 May 2019, petitioners filed a petition to adopt Wallace. That same day, petitioners filed a petition to terminate respondent's parental rights.[2] Petitioners

---

[2] Petitioners also filed a petition to terminate the parental rights of Wallace's mother, and her rights were terminated. She is not a party to this appeal.

alleged that in December 2015, prior to having custody of Wallace, they reported to Wallace's mother their observations that Wallace had weakness in the left side of his body and did not appear to be hitting age-appropriate milestones. However, Wallace's mother did not seek medical attention for Wallace to address their concerns. After they took custody of Wallace, petitioners immediately established medical care for Wallace, and on 29 June 2017, Wallace was diagnosed with cerebral palsy. Wallace was also diagnosed with a vision development disorder. He has numerous medical caregivers, including a primary care provider, pediatric neurologist, pediatric orthopedist, occupational therapist, physical therapist, and speech therapist, and petitioners have managed all medical care for Wallace since June 2017.

¶ 5 Petitioners further alleged as follows: respondent failed to obtain adequate medical care for Wallace; Wallace had been abused or neglected by respondent; respondent was incapable of providing for the proper care and supervision of Wallace such that Wallace was a dependent juvenile, and there was a reasonable probability that the incapacity would continue for the foreseeable future; respondent had willfully abandoned Wallace for at least six consecutive months immediately preceding the filing of the petition; respondent had not had any physical contact or communication with Wallace since August 2018; and respondent had not made any payments to petitioners for the benefit of Wallace.

¶ 6 A hearing on the petition to terminate respondent's parental rights was held

on 14 July 2020. The trial court entered an order on 22 September 2020 concluding that grounds existed to terminate respondent's parental rights in Wallace based on neglect, willfully leaving Wallace in a placement outside of the home for more than twelve months without making reasonable progress to correct the conditions that led to his removal, failure to pay child support, and willful abandonment. The trial court also determined that it was in Wallace's best interests that respondent's parental rights be terminated, and the court terminated his parental rights. Respondent appeals.

## II.    Analysis

¶ 7        Initially, respondent argues that the trial court committed prejudicial error by terminating his parental rights when it failed to articulate the specific statutory grounds supporting termination. Respondent's argument is based on the failure of the trial court to state in its "CONCLUSIONS OF LAW" section of the termination order which subsection of N.C.G.S. § 7B-1111 it was relying upon when determining that grounds existed to terminate his parental rights. We are not persuaded.

¶ 8        It is well established that in order to terminate a respondent's parental rights, the trial court must "adjudicate the existence . . . of any of the circumstances set forth in G.S. 7B-1111." N.C.G.S. § 7B-1109(e) (2019). "[T]he trial court must enter sufficient findings of fact and conclusions of law to reveal the reasoning which led to the court's ultimate decision." *In re D.R.B.*, 182 N.C. App. 733, 736 (2007). Whether a trial court

classifies statements as findings of fact or conclusions of law, "that classification decision does not alter the fact that the trial court's determination concerning the extent to which a parent's parental rights in a child are subject to termination on the basis of a particular ground must have sufficient support in the trial court's factual findings." *In re N.D.A.*, 373 N.C. 71, 77 (2019).

¶ 9 Under N.C.G.S. § 7B-1111(a)(1), a trial court may terminate parental rights if it concludes that the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.,* 375 N.C. 838, 841 (2020) (cleaned up).

¶ 10 Here, the trial court stated in finding of fact 88 that "[a]s to the ground of neglect in the for [sic] termination of parental rights, this Court has found herein

neglect in the past in 2017." Wallace was placed with petitioners in 2017 due to respondent's and Wallace's mother's drug addictions and the injurious environment in which Wallace was living. The trial court further found that there was a high probability of future neglect by respondent because he had not demonstrated that he had overcome his drug habit through completing substance abuse treatment in prison, by attending Narcotics Anonymous, or by receiving negative drug tests, and he had not completed any significant substance abuse treatment for methamphetamine use. In addition, the trial court found that respondent's pattern of inconsistent contact and lack of interest in Wallace, both before and after incarceration, revealed "a pattern of neglectful behavior and a higher likelihood of neglect in the future." These findings clearly reveal the trial court's reasoning which led to its ultimate determination to terminate respondent's parental rights for neglect under N.C.G.S. § 7B-1111(a)(1). Moreover, as later discussed, this determination is supported by ample evidence and findings. Thus, any potential error is harmless. *See In re Bluebird*, 105 N.C. App. 42, 51 (1992) (holding that although "[t]he more efficient and prudent practice for trial courts is to delineate the specific grounds for termination," the error is harmless when the findings of fact support a legal conclusion that grounds for termination exist).

¶ 11        Next, respondent argues that the trial court erred in concluding that grounds existed to terminate his parental rights based on neglect. We disagree.

¶ 12        "Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)). If the trial court finds the existence of one or more grounds to terminate the respondent's parental rights, the matter proceeds to the dispositional stage where the court must determine whether terminating the parent's rights is in the juvenile's best interests. N.C.G.S. § 7B-1110(a).

¶ 13        We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). Unchallenged findings are deemed to be supported by the evidence and are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437 (2019). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 14    Here, the trial court found that Wallace was born in April 2015, at a time when respondent was addicted to illegal drugs. In 2015, respondent was addicted to methamphetamines and supported his addiction by selling methamphetamines. After Wallace's birth, respondent did not live with Wallace, had minimal contact with him, and did not bond with him. Respondent never paid child support to Wallace's mother, who had custody of Wallace from his birth until 14 June 2017. Respondent was convicted in May 2016 in the United States District Court for the Western District of Virginia for conspiring to distribute methamphetamine and has a projected release date of July 2022. The trial court also made the following relevant findings of fact:

> 48. This Court finds that [Wallace] was a neglected juvenile in June of 2017; neglect has been proven by clear cogent and convincing evidence. [Wallace] had cerebral palsy and blindness in his left eye for a considerable time period and the Respondents, both who were addicted to drugs, failed to treat these medical issues, or get adequate medical treatment causing [Wallace] to suffer. Further, while he was in the physical custody of Respondent/Biological mother, [Wallace] was left in an area accessible to illegal drugs and marijuana and left alone in an unsafe and injurious environment. Further, Respondent/Biological Father had a long history of criminal activity and drug addiction that led to his incarceration, and Respondent/Biological Father could not protect [Wallace] or provide safe placement for him.

> 49. Since the Petitioners have had custody of [Wallace] from June 2017, [Wallace] has visited with Respondent/Biological Father at the Bennettsville, S.C. Federal Prison facility. The visits occurred in 2016, 2017,

and 2018 when [Wallace] was 2, 3, and 4 years old. He has not visited with Respondent/Biological Father in 2019 and in 2020, for a period of two years. [Wallace] does not remember the visits with Respondent/Biological Father. . . .

50. From June of 2017 to February 2020, Respondent/Biological Father called his mother[/]petitioner approximately once a month. Respondent/Biological Father asked his mother for money for his jail commissary account. Respondent/Biological Father said "hello" to [Wallace] on some calls. Respondent/Biological Father did not always ask to speak to [Wallace]. When he did ask, he was never denied the chance to speak to [Wallace]. Any of Respondent/Biological Father's conversations with [Wallace] at two and three years old were not substantive communication. When [Wallace] was 4 or 5, there was slightly more communication but not much. Respondent/Biological Father testified "it's hard to get a child that age to talk". The Court finds there was no meaningful substantive conversation between [Wallace] and Respondent/Biological Father during the calls that established a bond or a relationship between them. The Respondent/Biological Father did not inquire about [Wallace's] health, but the Petitioners did tell Respondent/Biological Father about updates on his serious health conditions. [Wallace] did not call Respondent/Biological Father "Dad" on the phone calls.

51. Since June of 2017 to June 11, 2020, the Respondent/Biological Father has sent emails on the Federal Bureau of Prisons website Core Links to his mother . . . . Respondent/Biological Father's emails to her were about his own status in jail and requests for money and were not concerned about [Wallace]. [Respondent's mother] told him Respondent/Biological Father that [Wallace] had cerebral palsy and about updates about [Wallace's] health. The Court finds that the emails did not help establish a bond or relationship between Respondent/Biological Father and [Wallace].

52. Respondent/Biological Father has not read books on cerebral palsy or any of [Wallace's] medical conditions or educated himself on those topics by using the prison library.

53. Respondent/Biological Father has never written a letter to [Wallace]. Respondent/Biological Father sent [Wallace] one birthday card. Respondent/Biological Father has been in prison for all five of [Wallace]'s birthdays.

54. Respondent/Biological Father sent one gift to [Wallace] at Christmas 2018 through the Toys for Tots program in prison.

. . . .

60. That [Wallace] has numerous medical and related caregivers in Forsyth County, including, but not limited to a primary care provider, a pediatric neurologist, a pediatric orthopedist, an occupational therapist . . . , a physical therapist . . . , speech therapists . . . , and psychologists.

. . . .

74. Respondent/Father has not assisted, offered to assist, contacted, or requested any information regarding [Wallace]'s numerous providers.

. . . .

77. Neither Respondent has assisted, offered to assist, contacted, or requested any information about [Wallace]'s daycare, early childhood, or school enrollment, or academic progress.

. . . .

79. The Respondent/Biological Father testified he has completed a mandatory 12-hour substance abuse

treatment course in 2017. He did not offer into evidence a certificate of completion. Therefore, the Court cannot assess the program. The Court does not find by clear, cogent, and convincing evidence that he completed a substance abuse program.

80. Respondent/Biological Father testified that there is a residential drug abuse treatment program [RDAP] for 12 months in the federal prison system. He stated he was on a waitlist. Significant to the Court is that he has not completed the program in the four (4) years he has been incarcerated. If he had completed it, [Wallace] would have been able to attend "family day" at prison and Respondent/Biological Father would have been able to spend quality time with [Wallace].

81. Respondent/Biological Father testified that he completed a parenting course in prison in 2017. He did not introduce a certificate of completion. Therefore, the Court cannot assess the program. The Court does not find by clear, cogent, and convincing evidence that Respondent/Biological Father completed a parenting class.

82. [Respondent's mother] testified that Respondent/Biological Father has admitted to her he still uses drugs in prison. She was concerned that the money she sent him was used to pay for drugs. On one occasion, she stated Respondent/Biological Father asked her to put money in a third party commissary account. When Petitioner looked up the third party on the Federal Bureau of Prisons 'Find An Inmate' website, she found this third person had been charged with selling drugs inside the prison. The Court does not find by clear, cogent, and convincing evidence that Respondent/Biological Father has continued to use illegal drugs in prison. He is given random drug screens in prison and no positive or negative tests were introduced into evidence for the Court to consider and make a finding of fact concerning drug use in prison.

. . . .

84. Respondent/Biological Father has a daughter . . . who is six months younger than [Wallace] . . . . Respondent/Biological Father communicates with [his daughter's mother] weekly and speaks to [his daughter] weekly. There was no evidence [his daughter] has special needs. Respondent/Biological Father has paid child support . . . [for his daughter] while incarcerated in 2016. . . . Respondent/Biological Father asks the Petitioners to bring [his daughter] to visit him in prison, but not [Wallace]. The Court finds as a fact that Respondent/Biological Father favors [his daughter] over [Wallace] in that he talks to her regularly, is interested in her wellbeing, and has sent financial support for her maintenance and not for [Wallace].

. . . .

86. On June 11, 2020, Respondent/Biological Father removed Petitioners from his email contact list on Core Links. . . . This prevented email contact between the parties from June 11, 2020, to present, approximately one month. . . .

. . . .

88. As to the ground of neglect in the for [sic] termination of parental rights, this Court has found herein neglect in the past in 2017. The Court must further determine whether there is a future likelihood of neglect when the child has been separated from the Respondents for a long period of time. In the instant case, [Wallace] was placed with the Petitioners in 2017 due to both of the Respondents' drug addictions and injurious environments. When Respondent/Biological Father was out on bail, he attempted a thirty day inpatient program for his methamphetamine addiction and failed to complete it. There has been no substantial change in three years to show the Court that either Respondent has beaten their drug habits. There has been no substantial change in three

years to show the Court that the Respondent/Biological Father has beaten his drug habit through substance abuse treatment in prison, by attending NA, or by negative drug tests. The Court finds there is high probability of neglect by both of Respondents as neither has completed any significant substance abuse treatment for methamphetamine. [This is true even if the Court considers Respondent/Biological Father's 12 hours of treatment, as it is not enough for his level of addiction]. Each of the Respondents' future behavior as addicts or using methamphetamines would create an injurious environment and have a severely adverse impact on [Wallace] and his course of treatment for serious medical conditions. This failure of both Respondents to complete substance abuse treatment is indicative of future neglect. The Court finds as a fact that the future likelihood of neglect has been proven by clear, cogent, and convincing evidence.

89. Respondent/Biological Father's incarceration is neither a sword nor a shield for him in this case. His incarceration does not shield him from his neglect of [Wallace]. The Court has looked at the Respondent/Biological Father's behavior before and during his incarceration. In looking at his behavior before incarceration, Respondent/Biological Father has a long history of drug use and criminal activity which leads to the conclusion that there is a high indication of future neglect. Before his incarceration, Respondent/Biological Father had no bond or relationship with [Wallace]. His prior history of inconsistent visitation and contact with [Wallace] [when he was in Respondent/Biological Mother's custody until the age of two] shows the Court a pattern of neglect. After Respondent/Biological Father's incarceration, he has continued a pattern of inconsistent contact with [Wallace] through July of 2020 by sending no letters, sending one card, and only sending one gift in 4 years. During his [incarceration], the Respondent/Biological Father has established no bond or relationship with [Wallace]. Both periods of time, before and after incarceration, show

inconsistent contact and lack of interest in [Wallace] by Respondent/Biological Father. This shows a pattern of neglectful behavior and a higher likelihood of neglect in the future.

¶ 15 Respondent challenges findings of fact 48, 50, 82, 88, and 89. With regard to finding of fact 48, petitioners' exhibit 3, which was submitted into evidence at the termination hearing, detailed respondent's lengthy criminal history dating back to 2012. Respondent's mother testified to respondent's history of drug use and that drugs were found within Wallace's reach while Wallace was in his mother's custody. Respondent's mother testified that as far back as December 2015, she observed Wallace and had concerns about his development. Wallace was not using his left arm, crawling**,** or attempting to stand. Respondent's mother voiced her concerns to Wallace's mother, but Wallace's mother did not seek medical attention. Immediately upon gaining custody of Wallace, petitioners took Wallace to get examined, and he was diagnosed with cerebral palsy and blindness in his left eye. Therefore, the trial court's finding of fact 48 is supported by clear, cogent, and convincing evidence.

¶ 16 As to finding of fact 50, testimony given at the termination hearing confirms that from the time petitioners had custody of Wallace until February, respondent would call his mother from prison approximately once a month. Petitioners testified that during these calls, respondent would ask his mother for money. Respondent testified that he would talk to Wallace on the phone "sometimes here and there." While respondent's mother allowed respondent to speak with Wallace, respondent

admitted that he could not "hold a conversation with a child [Wallace's] age." Wallace stopped calling respondent " 'dad' a while ago." Petitioners testified that although they shared Wallace's diagnoses with respondent, respondent did not inquire about Wallace's diagnoses or status of his health, inquire about Wallace's medical treatment, request copies of medical records, or ask for the names of Wallace's medical providers. Thus, finding of fact 50 is supported by clear, cogent, and convincing evidence, and the trial court's finding that there was "no meaningful substantive conversation" between respondent and Wallace is a reasonable inference from that evidence. *See In re D.L.W.*, 368 N.C. 835, 843 (2016) (stating that it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom).

¶ 17        Record evidence also supports finding of fact 82. Respondent's mother testified that respondent admitted to still using drugs in prison. Respondent asked her to put money in another prisoner's account, and when respondent's mother searched online for that inmate's name, she discovered that inmate was under investigation for smuggling drugs into prison. Respondent later testified that the prison administered random drug tests. From this evidence, it was within the trial court's discretion to not find by clear, cogent, and convincing evidence that respondent had continued to abuse illegal drugs in prison. *See In re D.L.W.*, 368 N.C. at 843.

¶ 18        With regard to finding of fact 88, respondent's mother testified that prior to

respondent pleading guilty to conspiracy to possess with intent to distribute fifty grams or more of methamphetamine in May 2016, he was out on bail. During this time, respondent began a thirty-day inpatient program for his drug addiction but failed to complete it. In June of 2017, Wallace entered petitioners' custody after his mother was arrested. Respondent testified that he finished a twelve-hour substance abuse treatment program in 2017. However, an unchallenged finding of fact, which is binding on appeal, establishes that respondent did not offer a certificate of completion for the twelve-hour program, and the trial court could not find by clear, cogent, and convincing evidence that he actually completed the program. Unchallenged finding of fact 80 also indicates that there was a twelve-month residential drug treatment program available to respondent, but he failed to complete the program during the four years he had been incarcerated. As such, the trial court's finding of fact 88 is supported by clear, cogent, and convincing evidence. Based upon the foregoing evidence and findings, the trial court made the reasonable inference that respondent had not made any substantial change in three years to demonstrate he had overcome his substance abuse issues and that respondent's future behavior of abusing drugs would create an injurious environment for Wallace. *See id.* The trial court's determination that there existed a high probability of future neglect by respondent is more properly classified a conclusion of law, s*ee Sparks*, 362 N.C. at 185, and we address respondent's challenge to this conclusion later.

¶ 19 Finally, respondent challenges finding of fact 89, but this finding is supported by clear, cogent, and convincing evidence. As previously discussed, petitioners' exhibit 3 reveals respondent's lengthy criminal history, and respondent's mother attested to respondent's history of drug use. Respondent was not present at Wallace's birth, and between Wallace's birth and respondent's arrest, Wallace visited respondent's house twice. During his four years of incarceration, respondent admitted to sending no letters, sending a single birthday card, and sending only one gift to Wallace. Respondent would talk to Wallace on the phone "sometimes here and there" when he called petitioners but stated that it was difficult to "hold a conversation" with Wallace. Wallace's guardian ad litem testified that Wallace considered petitioners his parents, not respondent or Wallace's mother. Accordingly, the trial court's finding of fact 88 is supported by clear, cogent, and convincing evidence. The trial court reasonably inferred from the foregoing evidence that respondent's inactions showed inconsistent contact and lack of interest in Wallace. *See In re D.L.W.*, 368 N.C. at 843. The trial court's determination that this showed a pattern of neglectful behavior and a higher likelihood of neglect in the future is more properly classified a conclusion of law, s*ee Sparks*, 362 N.C. at 185, and we address respondent's challenge to this conclusion next.

¶ 20 Respondent argues that evidence at the termination hearing showed his changed circumstances, in that he was no longer "the same man who had plead guilty

and went to prison" and that "[g]iven the steps taken by [him], the trial court erroneously found a probability of future neglect." He specifically contends that given his inability to pay child support and the efforts he made by taking advantage of programs offered in prison, the trial court erred in concluding there was a probability of future neglect. We disagree.

¶ 21     "Our precedents are quite clear—and remain in full force—that '[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision.' " *In re M.A.W.*, 370 N.C. 149, 153 (2017) (alteration in original) (quoting *In re P.L.P.*, 173 N.C. App. 1, 10 (2005)). Incarceration

> "does not negate a father's neglect of his child" because "[t]he sacrifices which parenthood often requires are not forfeited when the parent is in custody." Thus, while incarceration may limit a parent's ability "to show affection, it is not an excuse for [a parent's] failure to show interest in [a child's] welfare by whatever means available . . . ."

*In re S.D.*, 374 N.C. 67, 76 (2020) (alterations in original) (quoting *In re C.L.S.*, 245 N.C. App. 75, 78, *aff'd per curiam*, 369 N.C. 58 (2016)).

¶ 22     Respondent's argument that he lacked the ability to pay any child support because he only made $14 a month is undermined by the trial court's unchallenged finding that he sent money for his daughter's care while he was incarcerated. Moreover, the trial court also found, based on respondent's testimony, that respondent made small salaries from various positions he had while in prison but did

not provide support for Wallace. *See, e.g., In re Bradshaw*, 160 N.C. App. 677, 682 (2003) (affirming termination of parental rights based on neglect when the incarcerated respondent was able to earn a small income in prison but failed to provide any financial aid to the petitioner in support of his child).

¶ 23      Respondent's contention that the efforts he made by taking advantage of programs offered by the prison are likewise without merit. It is undisputed that Wallace was placed with petitioners in 2017 due to both respondent's and Wallace's mother's drug addictions and the injurious environment in which Wallace was living. The record demonstrates that respondent was incarcerated prior to the period of past neglect in June 2017 and was still incarcerated at the time of the termination hearing. Unchallenged finding of fact 80 establishes that during the four years respondent had been incarcerated, he did not engage in a residential drug abuse treatment program accessible to him through the prison system. This program would have given respondent the opportunity to spend quality time with Wallace through the attendance at "family day" in the prison. Unchallenged findings 79 and 81 also establish that respondent could not produce proof that he completed a twelve-hour substance abuse program and parenting course available to him in prison, and thus the trial court could not find by clear, cogent, and convincing evidence that respondent completed either. The foregoing findings support the trial court's determination that because respondent had not completed substance abuse

treatment, there had not been a substantial change in circumstances occurring between the period of past neglect and the time of the termination hearing.

¶ 24     In addition, the evidence and findings show that respondent made minimal efforts to show interest in Wallace's welfare while incarcerated. The last time respondent saw Wallace was in 2018. Although respondent called his mother approximately once a month, he did not always request to speak with Wallace and when he did, there was no meaningful, substantive conversation between them. Respondent's communications with his mother concerned his status in jail and requests for money. Despite being informed of Wallace's serious medical conditions from petitioners, respondent failed to inquire about Wallace's health, ask for updates on Wallace's serious health conditions, research any of Wallace's medical conditions, or request any information regarding Wallace's healthcare providers. In addition, he failed to request any information about Wallace's daycare or academic progress. While he was in prison for all five of Wallace's birthdays, he only sent a single birthday card to Wallace, never wrote a letter to Wallace, and sent only one Christmas gift to Wallace. Respondent removed petitioners from his email contact list in early June 2020, preventing the parties from communicating. Moreover, the evidence and findings show how differently he treated his daughter by communicating with her weekly, sending money for her benefit, inquiring about her welfare, and requesting that petitioners bring her to visit him in prison but not asking

that they bring Wallace.

¶ 25      The record evidence and the trial court's findings establish that respondent had not completed substance abuse treatment by the time of the termination hearing, and he failed to show interest in Wallace's welfare through the means available to him. Thus, the trial court reasonably concluded that there was a high probability that Wallace would be neglected in the future were he placed in respondent's care. *See In re D.L.A.D.*, 375 N.C. 565, 572 (2020) (holding that the trial court reasonably concluded the minor child would be neglected in the future if he were placed in the respondent-mother's care when she originally stated she wished to have her parental rights terminated, did not attempt to visit her child for a period of over a year, had substance abuse issues and no evidence showed she ever received treatment for those issues, and her boyfriend who had substance abuse issues lived in her home); *In re S.D.*, 374 N.C. at 87−88 (holding that evidence supported findings of past neglect and a repetition of neglect when the respondent had a history of criminal activity and substance abuse that resulted in his incarceration, failed to establish a relationship with his daughter prior to her being removed from the mother's care, only made minimal efforts to show interest in his daughter while incarcerated, failed to develop a relationship with or show an ability to care for his daughter since his release from incarceration, and failed to make significant progress toward correcting the barriers to reunification).

¶ 26        The trial court's finding that Wallace was previously neglected, which respondent does not challenge, and its determination that there was a high probability of a repetition of neglect support its conclusion that grounds existed to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(1). Because we uphold the trial court's adjudication of grounds to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(1) and respondent does not challenge the trial court's best interests determination at the dispositional stage, we do not address respondent's remaining arguments[3] and affirm the trial court's order terminating his parental rights in Wallace. *In re Moore*, 306 N.C. 394, 404 (1982) (holding that an appealed order should be affirmed when any of the grounds for termination upon which the trial court relied are supported by findings of fact based on clear, cogent, and convincing evidence); *see also* N.C.G.S. § 7B-1111(a) ("The court may terminate the parental rights upon a finding of one or more [grounds for termination.]").

AFFIRMED.

---

[3] Respondent challenges the trial court's conclusion that grounds existed to terminate his parental rights under N.C.G.S. § 7B-1111(a)(2)–(3), (7). He also argues that the petition to terminate his parental rights failed to provide sufficient notice that petitioners were alleging grounds under N.C.G.S. § 7B-1111(a)(2).